866 A.2d 195 (2005)
374 N.J. Super. 565
In the Matter of the Appeal of the Denial of SPORTSMAN'S RENDEZVOUS RETAIL FIREARMS DEALER'S LICENSE.
Superior Court of New Jersey, Appellate Division.
Submitted December 15, 2004.
Decided February 2, 2005.
Evan F. Nappen, Morristown, for appellant Sportsman's Rendezvous (Richard V. Gilbert, on the brief).
*196 J. Patrick Barnes, Hunterdon County Prosecutor, for respondent State of New Jersey (Sean M. Foxe, Assistant Prosecutor, of counsel and on the brief).
Before Judges NEWMAN, AXELRAD and HOLSTON, JR.
The opinion of the court was delivered by
AXELRAD, J.T.C. (temporarily assigned).
The issue before us is whether the failure to account for three firearms is sufficient evidence of "any danger to the public safety and welfare" under N.J.S.A. 2C:58-2 to justify denial of renewal of a New Jersey retail firearms dealer's license.
Sportsman's Rendezvous ("Sportsman") appeals from the denial of its application for renewal of its New Jersey retail firearms dealer's license. Pursuant to the recommendation of the investigating agency, based on a finding of unaccounted-for firearms and inadequate recordkeeping procedures and security at Sportsman's premises, the Law Division judge denied the application. Following an appeal of the summary denial, the Law Division judge conducted a plenary hearing in a de novo proceeding. The court determined the State had sustained its burden of proof that the applicant could not engage in business as a retail firearms dealer without "any danger to the public safety and welfare" under the provisions of N.J.S.A. 2C:58-2a. Accordingly, the court denied Sportsman's license to sell firearms and on August 26, 2003 entered the order which is the subject of this appeal.
On appeal, Sportsman contends the court erred in revoking its license based on a finding of only three unaccounted-for firearms, used the wrong standard in reaching its conclusion, shifted the burden of proof, and erred in deciding both the initial application and the appeal. Sportsman also contends the court's denial of its renewal application violates the doctrine of fundamental fairness. We are not persuaded by any of these arguments and affirm.

I
The following is a summary of the testimony and documentary evidence before the court. Sportsman has been a New Jersey firearms dealership for over ten years, continually possessing both federal and state licenses since it opened for business in 1988. The store has been located at Sportsman's Plaza, 174 Route 31 in Flemington, since 1995. The business has always been subject to periodic inspections by both the New Jersey State Police and the Federal Bureau of Alcohol, Tobacco and Firearms (BATF). Between November 2002 and January 30, 2003, BATF agent Renee Repasky inspected the premises and audited Sportsman's books. On January 30, 2003, she notified Patrolman J.R. Canonica of the Raritan Township Police Department that Sportsman could not account for eighteen firearms in its inventory. She advised Canonica she did not believe the missing firearms involved a criminal issue, but likely resulted from clerical and record keeping errors. BATF apparently issued a written warning and Canonica filed a police information report.
On March 6, 2003, in accordance with N.J.S.A. 2C:58-2, Sportsman's owner, Gustavio Riccioni, submitted an application for renewal of his New Jersey firearms dealer license number 3250 which was due to expire on May 25, 2003.[1] On March 26, *197 2003, Detective John Soulias of the Firearms Investigation Unit of the State Police conducted a cursory inspection of Sportsman's premises. Solulias noted in his report that the firearms acquisition and disposition ledgers and ammunition sales had not been properly recorded, referencing the BATF inspection. The manager, David Riccioni ("Riccioni"), presented him with eleven federal form # 4473's to resolve the disposition of eleven of the eighteen missing firearms.
The next day, Soulias and Sergeant Arsenio Gonzalez conducted an inspection of the entire firearms inventory, comparing every weapon on the rack with the acquisition and disposition ledger. They discovered that eleven additional firearms were missing  three black powder guns and eight BB rifles. These items were not considered to be weapons under federal guidelines and were thus not noted in the BATF audit. Additionally, Riccioni was advised that security at the store did not meet requisite standards. Specifically, the long guns were not secured on the shelf with cable wire and the handguns were not secured with a wire cable or placed in a steel safe at night to prevent them from being stolen, and there were no bars on the windows or doors of the premises. These security procedures were not contained in a written rule; they were a response by the Firearms Investigation Unit to an incident occurring elsewhere in 1995 or 1996 to prevent an intruder from breaking a window and stealing weapons.[2] Riccioni indicated this was his first notice of these security requirements. He was not given a deadline for upgrade of his security system.
According to Soulias, the security problem had not been addressed as of his return visit on April 8, 2003, although the security improvements were completed and approved by a subsequent inspection on May 25, 2003. Soulias acknowledged that Riccioni was cooperative during their inspections. In fact, during the April visit, Riccioni advised Soulias that he had found in his files a permit for a handgun sold on August 4, 1995, which had been completed but never forwarded to the State Police or local law enforcement as required by law. Soulias took the record for filing purposes. At that time, Riccioni was able to locate the completed documentation for thirteen of the eighteen missing firearms noted in the initial BATF inspection, and all eleven missing rifles noted in the State Police inspection. According to Soulias, subsequent document searches by Riccioni further reduced the number of unaccounted-for firearms to four: a Remington 12-gauge shotgun, a Remington 7mm rifle, a Mossberg 12-gauge shotgun, and a Ruger 22-caliber rifle.[3] Riccioni testified that the Ruger had also been returned to the supplier but acknowledged that he was unable *198 to locate any paper trail for the other three firearms. Riccioni believed, in all likelihood, the three weapons had been sold and proper records had been maintained and misfiled. However, Riccioni was unable to locate any documentation of the disposition of these three firearms as of the plenary hearing.
Soulias' testimony of Sportsman's recordkeeping was as follows:
[Sportsman's disposition records] were really, for lack of a better term, they were really a mess. There was no structure, no organization on how he maintained his records. I think that's why this situation escalated to where it did. His inability to maintain his records indicated why his firearms were in such a disarray, where he couldn't account for the weapons.
....
With Mr. Riccioni, when you say, sir, I need to see this document [of a firearm transaction], he had no idea where the document was, he had no idea what file it was in, it was ... just in disarray, how he maintains his records, or the inability of how he maintained them.
....
[I]n this case, there was no method on how he maintained the records.
Q. Did he write on the permits where it was located in the book?
A. Not that I recall, no.
Q. When you would make a request of him to locate certain documents, how would he go about attempting to find them?
A. He said he would have to go through the entire file to confirm....
Q. When you characterize his recordkeeping as being in disarray, in your six years of inspecting facilities, how would you characterize it in comparison of others you've inspected?
A. Probably one of the worst establishments referring to maintaining records that I've conducted an inspection on.
Based on this haphazard recordkeeping, Soulias testified that he had no idea if there had been a clerical mistake or the unaccounted-for firearms had actually been stolen from the store.
Corbley echoed the concern that "anytime there's a firearm that's unaccounted for, it certainly raises questions as to what happened .... was the gun shoplifted and not caught by the owner, was it disposed of in an unscrupulous manner or is it a bookkeeping error, or is it a combination thereof." Based on his review of at least l,000 inspection reports in the Firearms Investigation Unit since 1995, Corbley considered the inability to account for the disposition of a weapon to be a serious breach in terms of making a recommendation not to renew a retail firearms license. In the judgment of Corbley and his unit supervisor, Sportsman's business was not being conducted in a manner that would allow them to recommend renewal of its license.
As a result of the BATF audit and the five subsequent State Police inspections, in a May 21, 2003 report, the State Police recommended that Sportsman's license not be renewed. Sportsman was thereafter advised its renewal application had been disapproved by Judge Bartlett. Sportsman appealed the denial, and Judge Bartlett conducted a plenary hearing and de novo review of the renewal application on August 1 and 11, 2003. At the conclusion of the hearing, the court rendered an oral decision, memorialized in an order of August 26, 2003, affirming denial of Sportsman's retail firearms dealer's license.

II
Judge Bartlett found Sportsman met the standards and qualifications established by *199 the superintendent necessary to satisfy N.J.S.A. 2C:58-2 for a retail firearms dealer's license. Approval of the application therefore hinged on whether or not its continued engagement as a retail dealer of firearms could be carried out "without any danger to the public safety, health and welfare," the second-prong requirement of the statute. N.J.S.A. 2C:58-2a. This statute, "Licensing of retail dealers and their employees," provides in pertinent part:
The judge shall grant a license to an applicant if he [or she] finds that the applicant meets the standards and qualifications established by the superintendent and that the applicant can be permitted to engage in business as a retail dealer of firearms... without any danger to the public safety, health and welfare.
Noting the absence of case law or regulations interpreting the phrase "without any danger to the public safety, health and welfare" in the context of a retail dealers' license renewal, the court sought guidance from the conditions on issuance of a license and the breach of which would subject the license to revocation, enumerated in N.J.S.A. 2C:58-2, and the corresponding regulations, N.J.A.C. 13:54-3.4 and -3.9. N.J.S.A. 2C:58-2 establishes conditions for the issuance of a license to a retail firearms dealer, the breach of which shall subject the applicant to license revocation on the application of any law enforcement officer and after notice and hearing by the issuing court. The statute requires, among other items, the dealer to fully track and account for the make, model and serial number, description, source of receipt, date of receipt, disposition and date of disposition of every firearm. The relevant conditions include:
[a.] (4) No rifle or shotgun ... shall be delivered to any person unless such person possesses and exhibits a valid firearms purchaser identification card and furnishes the seller ... a certification signed by him setting forth his name, permanent address, firearms purchaser identification card number and such other information as the superintendent may ... require. The certification shall be retained by the dealer and shall be made available for inspection by any law enforcement officer at any reasonable time.
(5) No handgun shall be delivered to any person unless:
(a) Such person possesses and exhibits a valid permit to purchase a firearm ...
....
(6) The dealer shall keep a true record of every handgun sold, given or otherwise delivered or disposed of, in accordance with the provisions of subsections b. through e. of this section...
b. Records. Every person engaged in the retail business of selling, leasing or otherwise transferring a handgun, as a retail dealer or otherwise, shall keep a register in which shall be entered the time of the sale, lease or other transfer...
e. ... Within five days of the date of the sale, assignment or transfer, the dealer shall deliver or mail ... legible copies of the register forms to the office of chief of police of the municipality in which the purchaser resides ... and to the superintendent.
[N.J.S.A. 2C:58-2.]
N.J.A.C. 13:54-3.9 reiterates these conditions and imposes a similar recordkeeping requirement on retail dealers of all firearms as the Legislature imposed on retail dealers of handguns, N.J.S.A. 2C:58-2a(5), "the breach of which may result in license revocation by the court." N.J.A.C. 13:54-3.9(a) 6 (emphasis added). The superintendent included as a basis for revocation *200 that the license holder "poses a danger to the public health, safety or welfare." N.J.A.C. 13:54-3.9(a)7.
The court concluded that the conditions on issuance of a license, which were "very definite and very strict," were "the very definition of what would constitute the public safety, health and welfare in the context of whether a business ought to be selling retail firearms."
The court recognized that the State had the burden of proof by a preponderance of the competent evidence to demonstrate that the firearms dealer is a danger to the public health, safety and welfare. The court acknowledged that Riccioni had improved his records after the inspections; where they had previously been separated by year, they were now separated by month. The court further acknowledged it did not believe that the manager was engaging in black market sales of firearms or that he intentionally allowed these firearms to slip out of his business into the hands of unqualified recipients, and the missing records could just as well be a "matter of very sloppy bookkeeping." It was inconsequential to the review of this renewal application that previous inspections had overlooked these record discrepancies and apparently missing firearms. Because Sportsman failed to keep a record of every firearm sold or disposed of and was not able to demonstrate any one of the three missing firearms was sold or transferred to a lawful recipient, the judge determined the State had met its burden of proof justifying denial of Sportsman's license to sell firearms.
Judge Bartlett addressed Sportsman's argument that three accounting lapses out of 4,300 sales in fourteen years did not pose a danger to the community with the following insightful comment:
The firearms aren't there, the paperwork isn't there. In some matters, three out of 4300 is a very good, [a] very good record. But in the matter of firearms, it is a dismal record. Detective Sergeant Corbley testified that he has seen unaccounted for weapons in less than five out of a thousand inspections that he has done or reviewed, and that he considers this a real problem, it is a serious breach and this court has to agree. Firearms are something that are highly regulated in this state and I quote again from Adler v[.] Livak, 308 N.J.Super. 219[, 224, 705 A.2d 1218, 1220-21 (App.Div.1998)] that ... says as follows "the [l]egislature was undoubtedly aware of the strongly expressed views of many law enforcement officials who have long favored state and federal regulation of the sale and possession of firearms." Well, that is not just a sentiment of law enforcement, it is a sentiment that is hotly debated in our legislature, always one of the biggest issues in elections and in discussions of public policy issues.
She concluded that this kind of record keeping "is simply unacceptable in a self-regulated industry that involves lethal weapons" stating:
A firearm that goes missing, I agree that it's a real problem and just one firearm in this court's opinion that goes missing under these circumstances where the applicant has had now a couple of months to find the paperwork for it and still hasn't been able to do so, that is a fatal problem to the operation of this business. Three firearms just makes it triply risky, but it is a risk the public should not have to assume when it reposes in the courts and in the State Police and in the legislature as well, who makes these laws, the serious duty of protecting members of the public against unlicensed, black market firearms, firearms whose location [and] *201 owners are just simply unknown. They disappear and the eradication of the black market in firearms or firearms whose location and ownership are unknown is, as a public policy matter, a strong value in our society today and a bookkeeping or record keeping practice which allows three firearms to go missing is simply unacceptable.

III
The facts are undisputed. The court accepted Ricciano's representation of good faith at face value. Under Sportsman's best scenario, there is still unaccountability for three firearms. Our determination is a legal one requiring statutory construction of N.J.S.A. 2C:58-2. The standard of review is de novo. We are not obligated to defer to the legal conclusions of the trial court. Manalapan Realty v. Township Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230, 1237 (1995). We are satisfied, however, that Judge Bartlett correctly interpreted the adjective "any" within the context of the overwhelming policy in our State to regulate and limit the availability of weapons. We therefore adopt her analysis and conclusion. Permitted only two options by law, the grant or denial of Sportsman's renewal application, with no provision for a conditional denial, and having found the applicant could not engage in business as a retail dealer of firearms without endangering the public safety or welfare in the process, the only alternative under the statute appears to be the denial of Sportsman's renewal application.
According to a "Gun and Violence" Symposium at Northwestern University School of Law in 1995, New Jersey's regulation of retail firearms dealers is the strictest in the nation. Philip J. Cook et. al., Regulating Gun Markets, 86 J. Crim. L. & Criminology 59, 77 (1995). "There has been little construction of [Chapter 58] but what exists generally suggests that the licensing requirements will be construed so as to limit the availability of weapons." Cannel, New Jersey Criminal Code Annotated, comment 2 on N.J.S.A. 2C:58-1 (2005) (citing In re Preis, 118 N.J. 564, 573 A.2d 148 (1990); State v. Pleva, 203 N.J.Super. 178, 496 A.2d 375 (App.Div.1985); State v. Cunningham, 186 N.J.Super. 502, 453 A.2d 239 (App.Div.1982); Hoffman v. Union Cty. Prosecutor, 240 N.J.Super. 206, 572 A.2d 1200 (Law Div.1990); Crossroads Gun Shop v. Edwards, 214 N.J.Super. 244, 518 A.2d 799 (Law Div.1986); In re Rawls, 197 N.J.Super. 78, 484 A.2d 53 (Law Div.1984)).
Sportsman's argument that the State must prove the unaccounted-for firearms are in the hands of ineligible entities is contrary to this public policy. It is also contrary to the recordkeeping requirements of N.J.S.A. 2C:58-2a(5) and N.J.A.C. 13:54-3.9(a)6, which mandate retail firearms dealers to demonstrate that every firearm initially in its inventory remains in its inventory or has been transferred to an eligible person. To require the State to satisfy a burden of proving that unaccounted-for firearms are in the hands of ineligible persons, a burden created in the first place by a dealers deficient record keeping, would be contrary to the statute which requires adequate record keeping, not proof of wrongful disposal.
The record does not indicate whether the three missing firearms had also been unaccounted for when the court renewed Sportsman's license in 1997 and 2000. The firearms may have been lost or stolen after the 2000 inspection. The applicant may have sold them afterwards and failed to properly record the transactions. The applicant may have been able to produce the requisite records in previous inspections and subsequently misplaced them. Or, the *202 law enforcement officials who investigated the prior renewal applications may have overlooked the recordkeeping deficiency and have been unaware there were three potentially missing firearms. The prior conduct is immaterial to the renewal of Sportsman's 2003 license. Without records explaining the disposition of these three firearms, we are left to speculate as to the whereabouts of these weapons. The Legislature, and the agency administering firearms dealer's licenses, have mandated that such record keeping is a condition of the issuance of such license and the failure to do so is a serious enough breach that it may result in license revocation. N.J.S.A. 2C:58-2b and N.J.A.C. 13:54-3.9(a)6.
Sportsman further urges that three unaccounted-for firearms does not constitute sufficient grounds for denial of its renewal application, particularly where the missing two shotguns and hunting rifle are not of the size or type likely to be stolen or to be used in criminal pursuits. We are not persuaded by this argument. We recognize that neither N.J.S.A. 2C:58-2a nor its administrative regulations specifies the type or number of unaccounted-for firearms that would justify non-issuance or revocation of its retail firearms dealer's license.[4] That, however, does not end our inquiry.
The language of the statute is telling of the intent the Legislature wished to express in its crafting. "No retail dealer of firearms... shall sell or expose for sale, or possess with the intent of selling, any firearm unless licensed to do so as hereafter provided." N.J.S.A. 2C:58-2a (emphasis added). The statute prescribes the parameters for the retailing of any firearm"for the protection of the public safety, health and welfare." Ibid. Neither the statute nor the regulations, in their licensing requirements, distinguish between handguns and long guns or excludes firearms used for hunting. Regardless of their concealability or intended use, our lawmakers have recognized that all guns pose a significant risk to the public.
*203 Moreover, the Legislature chose to use the adjective "any" in the second-prong requirement for issuance of a license, i.e., if the judge finds the applicant can be permitted to engage in business as a retail dealer of firearms "without any danger to the public safety, health or welfare." N.J.S.A. 2C:58-2a (emphasis added). Considering the common-usage definition of "any" as "one or some, regardless of sort, quantity, or number," Webster's II New College Dictionary, 51 (1995), in the context of our State policy construing the licensing requirements to limit the availability of weapons, clearly suggests an intent by the Legislature to give this provision broad application.
It is not acceptable for the applicant to demonstrate it can engage in the business of retailing firearms with little danger, some danger, or even minor danger; the standard is that it must operate without any danger. We find completely unavailing Sportsman's argument that because the three missing firearms have not turned up stolen, been linked to a crime, or recovered under dubious circumstances, they do not pose a danger to the public. "Any" danger includes potential danger. Even though three unaccounted-for firearms may be a small percentage of the applicant's total firearms, the fact of the matter is that there are still three lethal weapons whose location and owners are unknown. The unaccountability of these three weapons, whether by poor record keeping or otherwise, creates a potential danger that the missing firearms will find their way into the hands of those who would unlawfully or irresponsibly use the firearms to threaten the public safety or welfare.
Our construction of the statutory language comports with its legislative intent of preventing criminals and other unfit persons from acquiring firearms and the public policy underlying the statutory licensing scheme. Burton v. Sills, 53 N.J. 86, 93, 248 A.2d 521, 524 (1968). "Wholly apart from the dangers which arise when firearms are in the hands of criminals, there is the potential for disaster when such weapons are acquired by the immature or the unfit or the addicted." Adler, supra, 308 N.J.Super. at 224, 705 A.2d at 1221.
It is irrelevant to the court's interpretation of N.J.S.A. 2C:58-2 that, as represented by Sportsman's, BATF only targets serious federal firearm licensed (FFL) dealer offenders, such as those who have had ten or more problems in a single year. Nor is it of any merit that eight of the ten "Worst `Bad Apple' Gun Dealers in America" as compiled by the Brady Campaign, based on national gun trace data from 1989 to 1996, none of which are located in New Jersey, are still in business. It is also irrelevant to this renewal application that BATF did not show any interest in revoking Riccioni's FFL, even though it was the federal inspection which initially uncovered eighteen unaccounted-for firearms.
Nor does the court's denial of Sportsman's renewal application violate the doctrine of fundamental fairness. The dispositive facts are not changed because Riccioni was forthcoming and cooperated with the authorities in their inspections of his premises and records, that he continued to search for missing records after the conclusion of the inspections, that he improved his record keeping with the lessons he learned, or that he promptly improved the security of his establishment as directed by the firearms investigators. As Corbley testified, the basis for recommending denial of the renewal application had nothing to do with the character or integrity of Riccioni. Notwithstanding Riccioni's cooperation and subsequent security improvements, the way the business was conducted which resulted in three *204 unaccounted-for firearms, was what presented a danger to the public and was fatal to the renewal application.
It might be helpful, as urged by Sportsman, for the regulatory agency to provide some type of recordkeeping instruction or training to retail firearms dealers. See N.J.S.A. 2C:58-2.1 (empowering the Superintendent of State Police, in consultation with the Attorney General, to promulgate guidelines to effectuate the purpose of the act). Requiring a retail firearms dealer to abide by strict recordkeeping rules without such training in order to retain its license and continue operations, however, does not constitute fundamental unfairness as has been defined by our courts. We note that Riccioni never claims to have sought out such assistance, despite his knowledge of the obligations imposed on him and the consequences attending any breach of these obligations.
Where constitutional protections do not adequately safeguard an important interest, principles of fundamental fairness may come into play. In Doe v. Poritz, 142 N.J. 1, 108, 662 A.2d 367, 421 (1995), our Supreme Court stated that our state's doctrine of fundamental fairness
"serves to protect citizens generally against unjust and arbitrary government action, and specifically against government procedures that tend to operate arbitrarily." State v. Ramseur, 106 N.J. 123, 377, 524 A.2d 188 [, 318] (1987) (Handler, J., dissenting). This unique doctrine is not appropriately applied in every case but only in those instances where the interests involved are especially compelling. "Fundamental fairness is a doctrine to be sparingly applied. It is appropriately applied in those rare cases where not to do so will subject the defendant to oppression, harassment, or egregious deprivation." State v. Yoskowitz, 116 N.J. 679, 712, 563 A.2d 1[, 17] (1989) (Garibaldi, J., concurring and dissenting).
Sportsman does not have a compelling, fundamental interest in retaining its firearm dealer's license as a constitutional, property or contract right. The cases relied upon by Sportsman in support of its claim of a compelling constitutional interest are inapposite. They involve fundamental or permanent liberty or property interests, such as the right to counsel (Rodriguez v. Rosenblatt, 58 N.J. 281, 277 A.2d 216 (1971)) or sex-offender registration (Doe v. Poritz, 142 N.J. 1, 662 A.2d 367 (1995)).
As argued by the State, Sportsman's interest in its firearms retail dealer's license is more akin to a liquor license. Our Supreme Court has determined that a liquor license is a privilege, not a right, of the licensee. Butler Oak Tavern v. Division of Alcoholic Beverage Control, Dep't. of Law and Public Safety, 20 N.J. 373, 381, 120 A.2d 24, 28 (1956) ("A license to sell intoxicating beverages is not a contract nor does it embody any property right. It is a temporary permit or privilege." (citation omitted)). Liquor sales and firearms sales are both highly regulated industries. Because of the dangers inherent in these retail products, the licensing and regulation requirements contain strict conditions and obligations. Moreover, the authorizing agency has the statutory authority to seek revocation of these licenses for breach of these conditions.
The only procedural protections Sportsman was entitled to was notice of the denial of its renewal application and an opportunity to be heard, both of which it received. The firearms investigators also gave Riccioni the same accommodation provided to other retail dealers, in that he was given several opportunities to locate the weapons or disposition documents over a two-month period before the recommendation *205 was made to deny renewal of Sportsman's permit.
Nor do we discern any error in Judge Bartlett's initial denial of Sportsman's application and her subsequent review and denial of the application in the de novo appeal proceeding. This is similar to the issuance of a temporary restraining order which may not result in a final restraining order based on the facts presented in a full hearing. We note that Sportsman's counsel raised no objection to Judge Bartlett presiding over the hearing, and thus we consider this challenge under a plain error standard. Rule 2:10-2. Sportsman has failed to present any reason why the interests of justice would warrant remanding the matter for a new hearing before a different judge who was not involved in the initial decision to deny its permit. Sportsman was not denied due process simply by having the same judge preside over both proceedings.
Sportsman makes no allegation, and the record is devoid of any evidence, that Judge Bartlett conducted the de novo hearing, or made her ruling, in a manner contrary to the doctrine of fundamental fairness. The initial review was conducted without hearing, based solely on the State Police's recommendation. There is no evidence of bias by Judge Bartlett. A complete hearing was conducted in which both sides presented witnesses. Riccioni testified at length on direct and rebuttal; and the State's witnesses, Soulias and Corbley, were sequestered and cross-examined by Sportsman's counsel. The majority of the exhibits were stipulated into evidence. Sportsman's counsel presented arguments by way of a formal brief. Moreover, the facts upon which the court made its ruling are not in dispute. The judge gave Riccioni the benefit of the doubt and concluded that the missing firearms were the result of sloppy book keeping, not black market sales. Moreover, our standard of review on this appeal is a further de novo legal interpretation.
Affirmed.
NOTES
[1] "Each [retail firearms dealer's] license [is] valid for a period of three years from the date of issuance ..." N.J.S.A. 2C:58-2a.
[2] In addition to an alarm system, N.J.A.C. 13:54-6.3, retail sellers are required to provide "internal security methods for the safeguarding of firearms and ammunition during nonbusiness hours." N.J.A.C. 13:54-6.5. A dealer is allowed to select the security methods most compatible with its business, subject to the approval of the Superintendent of State Police.
[3] The Firearms Applicant Investigation Report completed by James F. Corbley, Assistant Unit Supervisor of the State Police's Firearms Investigation Unit, on May 21, 2003, in reference to Sportsman's renewal application notes seven firearms missing, listing the following additional guns: a Beretta 12-gauge shotgun, a Winchester 45LC rifle and another Remington 12-gauge shotgun. Soulias testified that one of the Remington 12-gauge shotguns and the Berretta had been resolved. Riccioni testified that he had located the Winchester in the back of the store during the BATF inspection; it had been placed on a display rack with a "Do Not Touch" sign due to a round jammed into the rifle.
[4] Philip J. Cook, "Regulating Gun Markets," supra, 86 J. Crim. L. & Criminology at 76 (as of 1995, almost half the states did not impose licensing requirements on retail firearms dealers and some which impose such requirements do so solely for the purpose of raising revenue and include no regulatory or screening provisions.). At least eight states and the District of Columbia impose recordkeeping requirements similar to those imposed by N.J.S.A. 2C:58-2b and N.J.A.C. 13:54-3.9(a)6. The statutes of six of the nine jurisdictions vest no discretion in the state authority responsible for licensing retail firearms dealers, stating instead that a dealer shall forfeit his or her license upon violation of one of the state's licensing requirements, including its recordkeeping requirement. See ALA. CODE § 13A-11-78 (1975); ALA. CODE § 13a-11-79 (1975); D.C. CODE ANN § 7-2504.01 (2001); D.C. CODE ANN § 7-2504.04 (2001); D.C. CODE ANN § 7-2504.05 (2001); MD. CODE ANN., Public Safety, § 5-106 (2004); MD. CODE ANN., Public Safety, § 5-114 (2004); MD. CODE ANN., Public Safety, § 5-120 (2004); 18 PA. CONS. STAT. ANN. § 6112 (West 2004); 18 PA. CONS. STAT. ANN. § 6113 (West 2004); S.C. CODE ANN. § 23-31-150 (Law. Co-op. 1976); WASH. REV. CODE ANN. § 9.41.110 (West 2004). California's statute states that a violation of its licensing requirements "is a misdemeanor", without specifying whether the state's Department of Justice may, or shall, revoke the transgressing dealer's firearms license. Cal. Penal Code § 12073 (West 2004). Only two of the statutes employed language analogous to that of N.J.S.A. 2C:58-2. See HAW. REV. STAT. § 134-32(5) (2004) ("the license may be revoked for a violation of any of the conditions of this section"); MASS. GEN. LAWS. ANN. Ch. 140 § 125 (West 2004)("[t]he officials authorized to issue a license ... may declare [a] license forfeited, or may suspend [a] license for a period of time as they may deem proper, upon satisfactory proof that [a dealer] has violated or permitted a violation of any condition thereof or has violated any provision of this chapter, or has been convicted of a felony"). No cases in these jurisdictions address the issue of how many unaccounted-for firearms constitute sufficient grounds for denial, revocation, or nonrenewal of a retail firearms dealer's license.